IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CHRISTINA GONZALEZ, et al., on behalf ) 
of themselves and other similarly situated )
individuals, )
 )
      Plaintiffs, )
 )
v. )    NO. 3:10-00577
 )    JUDGE HAYNES
HCA, INC., *et. al.*, )
 )
      Defendants, )

## M E M O R A N D U M

Plaintiffs, Christina Gonzalez, a Texas citizen, and Sean Smith, a Missouri citizen, filed

this action on behalf of themselves and other similarly situated individuals, against the

Defendants: HCA, Inc. ("HCA"), a Delaware corporation with its principal place of business in

Tennessee; Northeast Methodist Hospital ("Northeast"), Methodist Healthcare System,[1] and

Methodist Healthcare System of San Antonio, Ltd., LLP ("MHSSA" or the "the Methodist

Defendants"), Texas corporations with their principal places of business in Texas; and Menorah

Medical Center ("Menorah"), a Kansas corporation with its principal place of business in

Kansas. (Docket Entry No. 1). Plaintiffs' claims arise under the Fair Labor Standards Act

("FLSA") 29 U.S.C. §§ 201 through 219 for the alleged wrongful denial of compensation.

Plaintiffs also assert original jurisdiction under "The Class Action Fairness Act of 2005", 28

U.S.C. § 1332(d) (2), the diversity statute, for their claims for unjust enrichment and back pay

under Texas and Kansas law.

---

[1] The Methodist Defendants contend that Methodist Healthcare System is not a cognizable legal
entity and is an improper party. (Docket Entry No. 47 at 1, n.1).

1

Plaintiffs' specific claims are that they performed compensable work during meal breaks for which Plaintiffs were not paid, as a result of an automatic deduction of thirty minutes for meal time. For their claims, Plaintiffs seek declaratory relief, statutory and liquidated damages, as well as reasonable attorneys' fees and costs. Plaintiffs also seek to certify this action as a national collective action under the FLSA, as well as statewide classes of Texas and Kansas employees under Fed. R. Civ. P. 23.

Before the Court are: (1) Plaintiffs' motion to certify a nationwide collective action under the FLSA as well as statewide classes for Texas and Kansas under Fed. R. Civ. P. 23 (Docket Entry No. 26); (2) Menorah's motions to dismiss for lack of personal jurisdiction. (Docket Entry No. 42); and (3) the Methodist Defendants' motions to dismiss for lack of personal jurisdiction. (Docket Entry No. 46).

In their motions to dismiss, the Defendants MHSSA and Menorah contend, in essence, that they lack any ties to Tennessee and Plaintiffs' claims arose in Texas and Kansas. Plaintiffs contend that the MHSSA and Menorah are subject to specific or general jurisdiction in Tennessee based upon their ties to HCA that provided MHSSA's and Menorah's computer based employee compensation systems. (Docket Entry Nos. 56 and 57). Alternatively, Plaintiffs seek a transfer of their claims to a proper forum, if the Court determines that jurisdiction over the Methodist Defendants and Menorah cannot be asserted in this district. Id.

Of these motions, the Court addresses first the Defendants MHSSA's and Menorah's motions to dismiss that challenge the Court's jurisdiction over them. Resolution of these motions directly impact consideration of the Plaintiff's motion for certification as a collective action under the FLSA and as class actions under Kansas and Texas laws.

### A. Analysis of the Motions to Dismiss

## 1. Plaintiffs' Complaint

According to their complaint, Plaintiff Christina Gonzalez, a Texas citizen, was previously employed in the cardiac unit at MHSSA's Northeast facility in Texas from April 2008 to October 2009. (Docket Entry No. 1 at ¶ 12). Plaintiff Sean Smith, a Missouri citizen, has been employed since approximately February 2007 as a CT Technician at Menorah's hospital in Kansas. Id. at ¶ 13. While working, Plaintiffs and their proposed class members allegedly were regularly required to perform compensable work during unpaid meal breaks. Id. at ¶¶ 12-13.

Plaintiffs' specific allegations are that "the wage and hour and all related employee compensation policies of Defendants are and were centrally and collectively dictated, controlled, and ratified" and were specifically "drafted, conceived, reviewed and/or disseminated" from Tennessee by HCA. Id. at ¶ 32. Plaintiffs allege that HCA-affiliated hospitals have experienced "'significant operating issue[s]'" because of a dearth of nurse and medical support personnel. Id. at ¶ 40 (quoting HCA's 10-K report)[2]. Because of these operating issues, Plaintiffs contend that Defendants were aware that Plaintiffs and class members worked through unpaid meal breaks to address hospital and patient needs. Id. at ¶ 41.

Plaintiffs further contend that Defendants do not ensure workers are completely relieved of their duties during unpaid meal breaks, sometimes requiring workers "to stay at their duty post[s]." Id. at ¶¶ 45-49. According to Plaintiffs, they are required to eat "without any change in demands from patients or relief by additional staff." Id. at ¶ 50. Plaintiff Gonzalez alleges that she and other nurses were "provided a phone at the start of every shift so that they could respond to pages/calls from doctors, lab technicians, family members of patients, and other

---

[2] HCA files an annual 10-K report with the United States Securities and Exchange Commission ("SEC") that consolidates its financial activities, including its operating subsidiaries. Id. at ¶ 29.

individuals" and that they were often required to respond to these calls during unpaid meal breaks. Id. at ¶ 51. Plaintiff Smith also asserts that he and other CT Technicians were required "to promptly respond to pages and provide [their] assistance in performing CAT scans of patients, regardless of whether [they were] on [a] meal break." Id.

Moreover, Plaintiffs allege that Defendants "improperly and illegally shift the burden to Plaintiffs and class members to ensure that non-qualifying 'meal breaks' are not deducted from their pay." Id. at ¶ 55. Finally, Plaintiffs allege that Defendants began changing their automatic meal-deduction policy on or about mid-2009, and nurses and other employees were then required to clock in and out for lunch. Id. at ¶ 57. Yet, "nurses were told that they would receive 'counseling' if they clocked in/out early for their scheduled break and were also advised that they would still be required to respond to pages," resulting in Plaintiffs and class members continuing to work without compensation. Id. at ¶¶ 57-58. Thus, Plaintiffs allege that they and potential class members "often worked in excess of forty hours per week and were denied statutory overtime wages." Id. at ¶ 60.

Plaintiffs contend that, as of December 31, 2009, HCA had approximately 190,000 employees and owned 35 hospitals in Texas and four in Kansas. Id. at ¶ 16. Plaintiffs quote HCA's 10-K report that describes HCA's substantial benefit from doing business in markets in other states:

> We believe the broad geographic presence of our facilities across a range of
> markets, in combination with the breadth and quality of services provided by our
> facilities, increases our attractiveness to patients and large employers and
> positions us to negotiate more favorable terms from commercial payers and
> increase the number of payers with whom we contract.

Id. at ¶ 29 (citation omitted).  According to the complaint, 51 percent of HCA's

consolidated revenues for the year ending on December 31, 2009, were derived from

Florida and Texas.  Id. at 7, n.1.

Plaintiffs assert that the time-keeping policies at issue were centrally conceived

by HCA and distributed to MHSSA and Menorah and other related HCA entities.  Id. at

¶ 32.  Plaintiffs also allege that HCA provides "'staffing initiatives for both care

providers and hospital management'" and "'strategies for recruitment, compensation and

productivity to increase employee retention and operating efficiency' at its hospitals."  Id.

at ¶ 36 (quoting HCA's 10-K report).  Plaintiffs' complaint asserts that HCA "maintains

an 'internal contract nursing agency to supply' its hospitals 'with high quality staffing at

a lower cost than external agencies.'"  Id. (quoting HCA's 10-K report).  HCA reports the

total number of beds at Affiliated Hospitals, the average length of stay for a patient, and

gross patient revenues.  Id. at ¶ 29.

For their allegations that Defendant HCA treats all employees as a single group, Plaintiffs

cite that HCA's Patient Safety and Quality of Care Committee Charter described on a HCA

website states that this Committee is tasked with "'oversight responsibilities relating to the

review of the Company's policies and procedures relating to the delivery of quality medical care

to patients.'"  Id. at ¶ 28 (quoting HCA's website).  This website describes the Committee's

responsibility to "'[r]eview, as appropriate, information relating to HCA quality, clinic risk,

patient safety and performance improvement.'"  Id. (quoting HCA's website).  According to the

complaint, the employee handbook reflects that at MHSSA facilities and other HCA Affiliated

Hospitals employees "are offered, among other things, consumer discounts and educational

opportunities, and wellness reimbursement."  Id. at ¶ 33.

## 2. Plaintiffs' Proof on Jurisdiction

From a review of their response to these motions, Plaintiffs cite a HCA website that lists MHSSA's Northeast hospital on its "Hospital locator." (Docket Entry No. 57, Plaintiffs' Response, Exhibit A thereto, at 4). Plaintiffs cite another website that reflects MHSSA's 19 health facilities that employ 7,000 persons. Id. at Exhibit B. Plaintiffs cited another HCA website reflecting that HCA has a "Patient Safety and Quality of Care Committee Charter" with "oversight responsibilities relating to the review of the Company's policies and procedures relating to the delivery of quality medical care to patients." Id., Exhibit C, at 2. Finally, Plaintiffs' proof includes a copy of a HCA website for job search listing its various locations. Id. at Exhibit D. This search form is blank except for references to "Texas-South" and "San Antonio." Id.

## 3. Defendants' Proof on Jurisdiction

### a. Menorah

Menorah, a Delaware corporation with its principal place of business in Kansas, operates one hospital in Kansas. (Docket Entry No. 43-1, Gafford Declaration at ¶ 2). HCA is the "indirect parent corporation of Menorah." Id. at ¶ 3. Menorah's executive officers, however, manage Menorah's operations and Menorah pays its officers' compensation. Id. at ¶¶ 4-5. These officers are not HCA employees. Id. at ¶ 5. Menorah's officers manage "all aspects" of Menorah's business, including all decisions involving non- exempt employees' pay, work schedule, and shifts. Id. at ¶¶ 7, 9-10. Neither HCA nor any other HCA subsidiary determines "the pay rate of Menorah's employees." Id. at ¶ 9. Prior to its acquisition or affiliation with HCA, Menorah's directors and managers "determined" the method "most effective" to communicate its "automatic meal deduction" policy and time keeping system. Id. at ¶¶ 22, 24.

Under this system, employees who worked through meal time are compensated.  Id. at ¶ 23.  Menorah trains and disciplines its employees, but has a contractual arrangement with HCA Management Services, Inc., as a consultant for various administrative, human resources, benefits and support services.  Id. at ¶¶ 12-14.

Menorah utilizes the  Kronos time keeper computer program for its payroll system.  Id. at ¶ 21.  Menorah lacks any ties to Tennessee as to Menorah's employees and the conduct of its business.  Id. at ¶ 15.

### b. MHSSA

According to Nancy Meadows, MHSSA's chief financial officer, MHSSA is a Texas limited liability partnership that is headquartered in San Antonio, Texas.  (Docket Entry No. 46-1, Meadows Declaration at ¶¶ 2-3).  MHSSA is a joint venture with equal 50% partners consisting of MHSSA, a Texas not-for-profit corporation and Columbia HCA of Central Texas, Inc., ("CHCACT") that has its principal office in Texas.  Id. at ¶ 5.  MHSSA owns Northeast Methodist Hospital that is not a separate entity.  Id. at ¶ 3.  MHSSA is not an HCA subsidiary.  Id. at ¶ 5.  "[T]he day-to-day operations of [MHSSA] are controlled by [MHSSA] management" that has "its own books, handles its own finances and pays its own taxes."  Id. at ¶ 6.  Each MHSSA facility in Texas "implements," "staff schedule, break times, and recording of work time."  Id. at ¶ 7.  Any services from HCA are by "contractual agreements" at "market value." Id.

### c. HCA

Given MHSSA's and Menorah's alleged ties to HCA and Plaintiffs' reliance on those ties for their prima facie showing of personal jurisdiction over MHSSA and Menorah, the Court considers the proof about HCA.

7

HCA, a Delaware corporation with its principal place of business in Tennessee, is a non-operating holding and parent corporation whose primary assets are the stocks and other equity interests of its subsidiaries. (Docket Entry No. 44, Bray Declaration at ¶ 3). HCA has "Operating Subsidiaries" that own and operate approximately 156 hospitals referred to as "Affiliated Hospitals" in the United States. Id. at ¶¶ 2, 5. HCA's Operating Subsidiaries are indirect HCA subsidiaries in that their stock and other equity interests are controlled through intermediary companies, each of which is a separate legal entity. Id. at ¶ 6. Thus, at least one level of ownership separates each Operating Subsidiary from HCA. Id. In a word, HCA does not directly own any of its Affiliated Hospitals. Id. at ¶¶ 7-14.

The Securities and Exchange Commission ("SEC") requires HCA to include and consolidate information regarding HCA subsidiary companies in HCA's 10-K report. Id. at ¶ 18. HCA's 10-K report states that "the 'terms 'Company,' 'HCA,' 'we,' 'our' or 'us,' as used herein refer to HCA Inc. and its affiliates unless otherwise stated or indicated by context.'" Id. at ¶ 19. HCA maintains a website at hcahealthcare.com. Id. at ¶ 20. While each Affiliated Hospital maintains its own website, HCA's website includes a "Locate a Facility" feature that allows visitors to view Affiliated Hospitals and link to an Affiliated Hospital's individual website. Id. at ¶ 21.

### (i). Operating Subsidiaries

Menorah and MHSSA are two of HCA's "Operating Subsidiaries" that conduct the business of its Affiliated Hospitals. Id. at ¶ 6. MHSSA owns the Northeast Hospital in Texas. (Docket Entry No. 47-1, Meadows Declaration at ¶ 3). MHSSA and CHCACT compose a joint venture with its principal place of business in Texas and the joint venture is an indirect subsidiary of HCA. Id. at ¶ 5. MHSSA and CHCACT each owns 50 percent of the joint

venture. Id. In a word, neither entity has a controlling interest. Id. Each HCA Operating Subsidiary also has its corporate board of directors, who appoint the corporate officers of the Operating Subsidiary. (Docket Entry No. 44-1, Bray Declaration at ¶ 14). Only one corporate director of HCA is a member of any of the various boards of directors of the Operating Subsidiaries and that director does not manage the day-to-day operations of nor maintain an office at any Affiliated Hospital. Id. at ¶ 14.

Each Operating Subsidiary acquires and provides its own health care services, initiates its own invoices, owns its own assets, incurs its own liabilities, generates its own income and incurs its own expenses, pays its own taxes, has its own employees, maintains its own books and records, prepares its own financial statements, provides its own benefits, and has its own insurance. Id. at ¶ 7. Each such subsidiary owns or leases its hospital building to provide health care and to house its business offices. Id. Operating subsidiaries control the acquisition and leasing of equipment and supplies, and control the cash from its operations through a cash management system. Id.

### (ii) Affiliated Hospitals

Each of HCA's Affiliated Hospitals has executive officers who are responsible for the management of the hospital's day-to-day operations. Id. at ¶ 8. These executives are officers and employees of the Operating Subsidiary that owns the Affiliated Hospital and the Operating Subsidiary pays their compensation. Id. at ¶ 9. Affiliated Hospitals' executives do not act as corporate officers or directors of HCA and in most circumstances, these executives are not directors of the Operating Subsidiary. Id. Each Affiliated Hospital has a local board of trustees, comprised of local medical staff, local business representatives and management, who possess

the final authority over clinical care policies, procedures, and practices at the hospitals. Id. at ¶ 10.

Affiliated Hospital executives report directly to two designated Operating Subsidiary's corporate officers. Id. at ¶ 14. Neither of these Operating Subsidiary corporate officers is an HCA corporate officer, but these subsidiary officers report to two senior HCA corporate officers. Id. Other corporate officers of the Operating Subsidiary, however, are HCA corporate officers. Id. These officers are not in the reporting structure for the Affiliated Hospital's executives. Id. HCA corporate officers, including the senior HCA officers, do not manage the day-to-day operations of any Affiliated Hospital nor maintain an office at any affiliated hospital. Id.

Affiliated Hospitals are responsible for all aspects of the management of its non-exempt hospital employees.[3] (Docket Entry No. 44-12, Coulter Declaration at ¶ 3). Each Affiliated Hospital maintains its own human resources department that controls the employment relationship with its respective hospital employees. Id. The Operating Subsidiary compensates the Affiliated Hospital employees, but the Affiliated Hospital alone determines an employee's rate of pay. Id. at ¶ 5. The Affiliated Hospital also determines the work schedule, including hours and shifts; the conditions of employment, including the workload of individual employees and departments; and the employee staffing levels. Id. at ¶¶ 6-7. Each Affiliated Hospital's human resources department is responsible for training employees as to their job duties and any policies incidental to the employment relationship, such as a time-keeping policy. Id. at ¶ 9. These human resources departments also maintain the employee personnel files of non-exempt

---

[3] An exception is Northeast, that leases its employees from CHCACT. (Docket Entry No. 44 at ¶ 16a).

hospital employees. Id. at ¶ 10. Affiliate Hospitals alone have the power to hire, suspend, terminate, or otherwise discipline or reward their employees. Id. at ¶ 11.

Operating Subsidiaries and Affiliated Hospitals do not internalize all administrative functions, but purchase administrative-support services from HCA Management Services, L.P. ("HCA Management"), a HCA subsidiary [4] Id. at ¶¶ 12-14, 24. These services are provided under support service agreements at the request of an Affiliated Hospital. Id. at ¶ 17. Under these agreements, Operating Subsidiaries and Affiliated Hospitals maintain full authority and responsibility for the management and operation of their facilities, including all aspects of the employment relationship. Id. Among its services to Affiliated Hospitals, HCA Management provides time-keeping and payroll systems that includes the "Kronos" time-keeping software. Id. at ¶¶ 18-19. Prior to 2009, HCA Management provided Affiliated Hospitals with the Kronos system that had a default function that automatically deducted a meal break. Id. at ¶ 26. Under this system, thirty minutes for meals are automatically deducted for meal breaks during the shifts of non-exempt employees of Affiliated Hospitals. (Docket Entry No. 47-2, Flanagan Declaration at ¶ 5). During the relevant period of this action, some Affiliated Hospitals elected not to utilize the automatic deduction default function. (Docket Entry No. 44-12, Coulter Declaration at ¶ 29).

Neither HCA nor HCA Management is responsible for monitoring, changing, or approving changes to an employee's timecard. Id. at ¶ 24. Upon an Affiliated Hospital's request, HCA Management could change the default Kronos settings, including the default function for automatic meal-break deductions. Id. at ¶ 28. This automatic meal-break deduction was not implemented as a time-keeping policy of HCA or HCA Management, but was the policy

---

[4] The Court acknowledges that HCA Management is a Delaware corporation, but Plaintiffs' proof does not reflect where HCA Management does business.

11

choice of each Operating Subsidiary and Affiliated Hospital. Id. at ¶ 27. MHSSA's Northeast hospital's management was and remains responsible for implementing policies and procedures, including the time-keeping policies at issue. (Docket Entry No. 46-1, Meadows Declaration at ¶¶ 3, 6-7). Menorah's employees are subject to the policies and procedures of, the management of, and compensation by Menorah and that the time-keeping policies at issue were developed by local Menorah managers. (Docket Entry No. 43-1, Gafford Declaration at ¶¶ 7-11).

Affiliated Hospitals are responsible for operating and implementation for the Kronos system for their employees. (Docket Entry No. 44-12, Coulter Declaration at ¶ 23). Each Affiliated Hospital makes any necessary adjustment to a hospital employee's timecard in the time-keeping system. Id. Affiliated Hospitals are responsible for training hospital employees on all issues related to automatic meal-break deductions, including how and when to report instances that an employee may have worked during a meal break. Id. at ¶ 30. Each Affiliated Hospital determines the methods that their employees use to report time worked during a meal break. For instance, the Methodist Defendants' employees are able to override an automatic meal deduction, if required to work through a meal break, by keying a particular code into the time clock. (Docket Entry No. 48-2, Flanagan Declaration at ¶¶ 5-6). The Methodist Defendants describe the time-keeping policy as varying throughout the hospital. Id. at ¶ 6. Some departmental supervisors, not employees, override the automatic deduction either manually or on the timeclock after being alerted to time worked by an employee. Id. at ¶ 7.

## B. Conclusions of Law

There are two types of personal jurisdiction: "specific jurisdiction" and "general jurisdiction." Specific jurisdiction over a defendant exists where the action "aris[es] out of or related to the defendant's contacts with the forum." Helicopteros Nacionales de Columbia v.

Hall, 466 U.S. 408, 414 n.8 (1984).  General jurisdiction requires a defendant's contacts that are of "a 'continuous and systematic' nature."  Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445 (1952). See also  Third Nat'l Bank v. WEDGE Group, Inc., 882 F.2d 1087, 1089 (6th Cir. 1989).

On Defendants' motions to dismiss for lack of personal jurisdiction, Plaintiffs bear the burden of a prima facie showing of personal jurisdiction, that is, some proof to support the Court's exercise of jurisdiction over these Defendants.  Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991). See also CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1261-62 (6th Cir. 1996).  When a district court rules on Fed. R. Civ. P. 12(b) (2) motion without conducting an evidentiary hearing, the Court must consider the pleadings and affidavits in a light most favorable to the plaintiff.  Theunissen, 935 F.2d at 1458-59.  See also Welsh v. Gibbs, 631 F.2d 436, 438 (6th Cir. 1980). Moreover, in such instances, the Court "does not weigh the controverting assertions of the party seeking dismissal". CompuServe., 89 F.3d at 1262 (emphasis omitted).  The Sixth Circuit explained that "we want 'to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts.'  Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff alleges collectively fail to state a prima facie case for jurisdiction."  Id. (quoting Theunissen, 935 F.2d at 1459).  Here, the Defendants have presented affidavits with specific and undisputed facts to support their jurisdictional challenges.

### 1.  Specific Jurisdiction

Specific jurisdiction exists where the action "aris[es] out of or related to the defendant's contacts with the forum." Helicopteros Nacionales de Columbia, 466 U.S. at 414 n.8.

In Southern Machine Co., Inc. v. Mohasco Indus., Inc., 401 F.2d 374 (6th Cir. 1968), the Sixth

Circuit summarized the governing principles in a three-part test for determining whether specific

jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in
> the forum state or causing a consequence of the forum state. Second, the cause of
> action must arise from the defendant's activities there. Finally, the acts of the
> defendant or consequences caused by the defendant must have a substantial
> enough connection with the forum state to make the exercise of jurisdiction over
> the defendant reasonable.

Id. at 381 (footnote omitted). The Sixth Circuit has held that "each criterion represents an

independent requirement, and failure to meet any one of the three means that personal

jurisdiction may not be invoked." LAK, Inc. v. Deer Creek Enters., 885 F.2d 1293, 1303 (6th

Cir. 1989).

As the Sixth Circuit later stated, "[t]he 'sine qua non' of personal jurisdiction is the

purposeful availment factor under which the defendant must 'purposefully avail[ ] itself of the

privilege of conducting activities within the forum State, thus invoking the benefits and

protections of its laws.'" Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1273 (6th Cir. 1998)

(quoting Burger King Corp. v. Rudzewicz, 471 U.S.462, 475 (1985) (with citation omitted and

emphasis added)). "This 'purposeful availment' requirement ensures that a defendant will not be

haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of

the 'unilateral activity of another party or a third person.'" Burger King, 471 U.S. at 475

(citations omitted).

Here, the Defendants MHSSA and Menorah contend that they have not purposefully

availed themselves of the Tennessee forum and that Plaintiffs' claims do not arise out of or relate

14

to Tennessee, but relate solely to Plaintiffs' work and these Defendants' policies in Texas and Kansas, respectively. (Docket Entry Nos. 43 and 47).

Plaintiffs respond that the Defendants MHSSA and Menorah "chose to make themselves a part of a conglomerate that is partially owned by a Tennessee corporation." (Docket Entry Nos. 56 at 9 and 57 at 10). Plaintiffs contend that HCA controls the level of staffing at its Affiliated Hospitals, including MHSSA's Northeast Hospital and Menorah. (Docket Entry Nos. 56 at 8 and 57 at 9). Plaintiffs argue that HCA distributes a report to its Affiliated Hospitals, including MHSSA's Northeast and Menorah, informing them how to implement a "bare bones staffing structure." (Docket Entry Nos. 56 at 8 and 57 at 9). Plaintiffs cite a final judgment in HCA v. Batsuk[5] (Docket Entry No. 54, Exhibit C) describing HCA's system's staff-optimizing capabilities and an article from businesstn.com. Id. Exhibit B (describing the PLUS system's day-to-day function of distributing optimized staffing levels to Affiliated Hospitals from Nashville). Moreover, Plaintiffs cite HCA Management's providing the Defendants Methodist and Menorah with the Kronos time-keeping system through support service agreements. (Docket Entry Nos. 56 at 8 and 57 at 9).

As to the "arising from" requirement, the operative facts of the controversy must arise from the defendant's contacts with the state. Calphalon Corp. v. Rowlette, 228 F.3d 718, 723 (6th Cir. 2000). If the conduct at issue does not arise from "'the very soil from which the action . . . grew,' the exercise of jurisdiction may still be deemed reasonable if … the consequences of the act or breach caused by the defendant have a substantial enough connection with the forum

---

[5] The Court cannot discern the full citation to this state court action. However, the proceeding occurred in Davidson County's Chancery Court with docket number 02-2715-I. (Docket Entry No. 54, Exs. A and C).

state." Id. at 724. Here, neither the facts nor the consequences of the acts at issue occurred in

Tennessee. The Defendants MHSSA and Menorah are in Texas and Kansas respectively and

each exercises responsibility for their employees' pay, their timecards and other terms and

conditions of employment in those States. The time-keeping policy at issue was implemented in

Texas and Kansas and any wages Plaintiff may be due were withheld in those states. Thus,

Plaintiffs cannot show that their claims against the Methodist Defendants and Menorah arose

from a substantial connection with Tennessee.

As to whether Plaintiffs' reliance on Defendants MHSSA's and Menorah's ties to HCA

establishes those Defendants' purposeful availment of doing business in Tennessee, the Western

District of Tennessee summarized the factors courts consider in evaluating personal jurisdiction

based upon corporate structure:

> As this court stated in Cupp v. Alberto-Culver USA, Inc., although "corporate
> relationships may be a factor in assessing forum contacts, . . . **a company does
> not purposefully avail itself of the forum merely by owning some or all of a
> corporation subject to jurisdiction in the forum.**" (citation omitted). "Personal
> jurisdiction must be based on something that the defendant itself has done
> involving the forum . . . [.] **Corporate ownership alone is insufficient for the
> exercise of personal jurisdiction.**" 308 F. Supp. 2d 873, 878-79 (W.D. Tenn.
> 2004).
>
> *     *     *
>
> **The reasoning of Cupp should apply even more forcefully in the present case
> where the non-resident company in question is not the owner but is *owned* by
> a corporation subject to jurisdiction in the forum . . . [.]**

American Copper & Brass, Inc. v. Mueller Europe, Ltd., 452 F. Supp. 2d 821, 828-29 (W.D.

Tenn. 2006) (emphasis in the original and in part added).

MHSSA is not an HCA entity. HCA is Menorah's "indirect corporate" panel. Neither

MHS nor Menorah have any employees, property or business in Tennessee nor do these

Defendants solicit business in Tennessee. Neither MHSSA's nor Menorah's employees are residents of Tennessee. HCA Affiliated Hospitals, controlled by local boards, decide whether to implement the Kronos system. In fact, some HCA Affiliated Hospitals have declined the Kronos system. Whatever administrative services HCA Management provides, a single contract is insufficient to show purposeful availment. Air Prods. & Controls, Inc. v. Safetech Intern., Inc., 503 F.3d 544, 551 (6th Cir. 2007).

As to whether Defendants MHSSA's and Menorah's acts or consequences have a substantial connection to this forum, the exercise of jurisdiction must "comport with 'traditional notions of fair play and substantial justice.'" Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1117 (6th Cir. 1994) (quoting Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)). On these evaluations, the following factors to consider are:

> . . . the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies."

Id. (quoting Asahi Metal, 480 U.S. at 113) (citation omitted).

Here, litigation in Tennessee would impose substantial burdens on the Defendants MHSSA and Menorah, foreign corporations, whose managers and employees who are knowledgeable about this controversy, including Plaintiffs, are in Texas and Kansas. Tennessee's interest as a litigation forum is less than Texas and Kansas, whose citizens are alleged to be the injured employees and whose laws were allegedly violated. As citizens of Texas and Kansas, Plaintiffs' interests are better served by an action in those states where the witnesses, including Plaintiffs and relevant documents are and where the Kronos time-keeping

policies were implemented. Plaintiffs' compensation was allegedly withheld in Texas and Kansas. These collective facts do not support a finding of specific jurisdiction.

## 2. General Jurisdiction

The Court next considers whether general jurisdiction exists over Defendants Methodist and Menorah, that is, whether Defendants' contacts with Tennessee are of "'such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state.'" Bird v. Parsons, 289 F.3d 865, 873 (6th Cir. 2002) (quoting WEDGE Group, 882 F.2d at 1089). For the reasons stated in the specific jurisdiction analysis, the Court concludes that Defendants MHSSA and Menorah lack any continuous conduct in Tennessee to justify this Court's exercise of general jurisdiction.

For their state law claims, Plaintiffs assert original jurisdiction under the diversity statute, 28 U.S.C. § 1332(d)(2). As to MHSS's and Menorah's ties to HCA as establishing diversity jurisdiction, the extent of due process is defined by state law. WEDGE Group, 882 F.2d at 1089. In Gordon v. Greenview Hosp., Inc., 300 S.W.3d 635 (Tenn. 2009), the Tennessee Supreme Court held that the presence of a parent corporation's officers in Tennessee did not justify a finding of general jurisdiction over the corporate parent.

> Ms. Gordon's lawyer has pointed to no case holding that corporate officers or directors maintaining an office or a residence in the forum state is sufficient to establish general jurisdiction over the corporation. And with good reason. A corporation is a distinct legal entity that exists separately from its shareholders, officers, and directors. In this age of electronic communications, telecommuting, and distributed management, the fact that Greenview's officers and directors maintain offices in Tennessee does not, by itself, lead to the conclusion that the corporation has continuous and systematic contact with Tennessee or that the corporation is conducting business within the state.

Id. at 649-50. (citations omitted). There, the plaintiff "failed to demonstrate the extent to which [the defendant's] officers and directors were conducting the corporation's day-to-day business operations" from within the forum, and thus, the presence of the officers in the forum was not a substantial, systematic and continuous contact, for the purpose of general jurisdiction. Id.

Under Gordon, "[p]arent and subsidiary corporations are presumed to be separate and distinct legal entities." Id. at 651(citations omitted). As to a corporate parent, "general involvement with the subsidiary corporation's performance, finance and budget decisions, and general policies and procedures does not provide a basis for attributing one corporation's contracts with the forum to the other for the purposes of personal jurisdiction." Id. at 651-52. The Tennessee Supreme Court rejected a claim that a foreign corporation's listing of its counsel as its principal address established personal jurisdiction over the foreign corporation. Id. at 650-51.

Applying Gordon, the Court concludes that HCA's status as MHSSA's and Menorah's indirect corporate parent is insufficient to establish jurisdiction over MHSSA and Menorah. For the reasons stated in the specific jurisdiction analysis, the Court also concludes that MHSSA and Menorah operate as independent entities.

Plaintiffs next assert the alter ego theory for jurisdiction over MHSSA and Menorah. In Southeast Texas Inns, Inc. v. Prime Hospitality Corp., 462 F.3d 666 ( 2006), the Sixth Circuit applied Tennessee's law on this theory:

> ("[T]he alter ego theory requires that the corporate structure cause fraud or similar injustice[;]" thus, "[m]ere dominion and control of the parent over the subsidiary [alone] will not support alter ego liability."); Wallace v. Wood, 752 A.2d 1175, 1184 (Del.Ch.1999) ( "Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for

fraud.") (footnote and internal quotations omitted). <u>Accord</u> <u>Continental Bankers</u>
<u>Life Ins. Co. of the South v. Bank of Alamo</u>, 578 S.W.2d 625, 632 (Tenn. 1979)
(the control of the parent corporation over the subsidiary "must have been used to
commit a fraud or wrong[.]"); <u>Elec. Power Bd. of Chattanooga v. St. Joseph Valley</u>
<u>Structural Steel Corp.</u>, 691 S.W.2d 522, 526 (Tenn.1985) (quoting the <u>Continental</u>
<u>Bankers</u> test); <u>Tenn. Racquetball Investors, Ltd. v. Bell</u>, 709 S.W.2d 617, 622
(Tenn.Ct.App.1986) (citing <u>Continental Bankers</u> and noting that under an alter ego
theory of liability, "mere dominance, standing alone, does not render [a corporate
director] liable for the corporate debts"; "[u]se of control to commit fraud or
wrong" is also required to fix liability).

<u>Id.</u>, at 674 (footnote omitted).  Plaintiffs do not present any evidence to meet this standard.

Here, Plaintiffs' allegations of HCA's control over the Defendants MHSSA and
Menorah's time-keeping policy is directly contradicted by proof with specific facts that
MHSSA's and Menorah's officers and managers control their employees' compensation and
work schedule.  Menorah asserts that its meal deduction policy was enacted prior to its affiliation
with HCA.  Plaintiffs cite HCA Management's provision of the Kronos computer system that
functions to deduct automatically meal breaks.  Under the showing here, the acceptance and
implementation of that system is a local decision of the Affiliated Hospitals that are managed by
local boards and over which HCA lacks authority.  Moreover, some HCA Affiliated Hospitals
elected not to utilize the Kronos computer system.

On a directly related issue, Plaintiffs assert the joint-employer rule for their FLSA claims
against HCA.  An "employer" under the FLSA is broadly defined as "any person acting directly
or indirectly in the interest of an employer in relation to an employee . . . [.]"  29 U.S.C. §
203(d).  Separate entities that share control over an individual worker may be deemed "joint
employers" under the FLSA.  29 C.F.R. § 791.2(a).  "[A]ll joint employers are responsible, both
individually and jointly, for compliance with" the FLSA.  <u>Id.</u>  The Department of Labor
regulations provide examples of situations in which a joint employment relationship exists:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

Id. § 79.2(b) (footnotes omitted).

"The FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991) (citations omitted). "'The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications.'" Id. (quoting McLaughlin v. Seafood, Inc., 867 F.2d 875, 877 (5th Cir. 1989) (per curiam)). To determine whether an entity is an "employer" subject to the FLSA, the Court must consider the "economic reality" of the situation. United States Dep't. of Labor v. Cole Enters., Inc., 62 F.3d 775, 778 (6th Cir. 1995).

"[T]o be considered an 'employer,' it is not necessary that a person have exclusive control of a corporation's day-to-day functions. An employer need only have 'operational control of significant aspects of the corporation's day-to-day functions . . . .'" Reich v. Cole Enters., Inc., 901 F. Supp. 255, 259 (S.D. Ohio 1993) (quoting Donovan v. Agnew, 712 F.2d 1509, 1514 (1st Cir. 1983) and citing Dole, 942 F.2d at 969). Thus, whether a joint employment relationship exists is largely an issue of control. Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No. 1931 v. Norfolk S. Corp., 927 F.2d 900, 902 (6th Cir. 1991). The Sixth Circuit has acknowledged four factors in determining "whether two companies are joint employers: the

21

interrelation of operations between the companies, common management, centralized control of labor relations, and common ownership." Id. (quoting Metro. Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co., 672 F.2d 580, 584 (6th Cir. 1982)).

Likewise, under the integrated enterprise test, a parent corporation may be considered the employer of a subsidiary company's employees where the "'two entities are so interrelated that they may be considered a 'single employer' or 'integrated enterprise.'" Smith v. Cheesecake Factory Rests., Inc., No. 3:06-00829, 2010 WL 441562, at *11 (M.D. Tenn. Fed. 4, 2010) (citations omitted).

> The Sixth Circuit employs the "economic realities" test to determine whether an individual may be considered an employer under the FLSA. This test examines whether the individual "has a significant ownership interest in [the corporation that employs the plaintiffs], controls significant functions of the business, and determines salaries and makes hiring decisions." United States Dept. of Labor v. Cole Enterprises, 62 F.3d 775, 778 (6th Cir.1995); Feeley v. Higgins, 19 F.3d 1126 (6th Cir.1994). The test focuses on whether the individual was the person who made the decisions that allegedly violated the FLSA. Thus, a plaintiff must plead and prove that the individual defendant: (1) was a "corporate officer" of the covered employer; (2) held a "significant ownership interest" in the covered employer; and (3) exercised "operational control of significant aspects of the corporation's day to day functions." Cole Enterprises, 62 F.3d at 778 (citing Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962 (6th Cir.1991)).
>
> * * *
>
> In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common recordkeeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control. None of these factors is conclusive, and all four need not be met in every case. However, control over the elements of labor relations is a central concern. The integrated enterprise analysis ultimately focuses upon whether the parent corporation was the final decision-maker with regard to the employment issue underlying the litigation.

Id. at 12, 11 (citations and quotation marks omitted).

Under the first two factors, HCA and the Defendants NMHS and Menorah are separate corporate entities. Whatever administrative functions HCA management provides as the parent corporation, the Defendants MHSS and Menorah as well as HCA's Operating Subsidiaries and Affiliated Hospitals decide and implement the pay and scheduling policies. These entities maintain separate bank accounts, financial records, payroll records as well as control their real estate, leases, equipment, and supplies. Defendants MHSSA's and Menorah's officers are not HCA corporate officers or directors and are compensated by them, not HCA. Some Affiliated Hospitals declined the Kronos system at issue here. These facts do not establish common management or interrelation of operations between HCA and the Defendants MHSSS and Menorah.

Under the third and fourth factors, HCA's corporate human resources department provides leadership training, but Defendant MHSSA's and Menorah's employees are subject to their directors' and officers' control as to compensation, hiring, firing, promoting, and disciplining employees. MHSSA and Menorah control their finances for day-to-day operations. HCA's control of labor relations is not so centralized as to demonstrate an integrated enterprise. "A parent corporation is entitled to establish group-wide financial protocols, monitor the performance of its subsidiaries, and reap financial benefits from their profits." In re Chocolate Confectionary Antitrust Litig., 641 F. Supp.2d 367, 394 (M.D. Pa. 2009) ("Chocolate Confectionary II") (citing United States v. Bestfoods, 524 U.S. 51, 71 (1998)).

Plaintiffs cite a United States Department of Labor letter, (Docket Entry No. 27, Attachment 11), to support their contention that HCA is their employer, but that letter does not address whether the parent company is a joint employer. The cited letter involved whether two subsidiary companies owned by one parent corporation can be considered a joint employer. Id.

23

Under the facts here, the Court concludes that HCA is not Plaintiffs' employer under the FLSA, and Plaintiffs' motion for conditional certification under the FLSA as to HCA (Docket Entry No. 26) should be denied.

As to Plaintiffs' alternate request for a transfer, 28 U.S.C. § 1631 provides that if the Court "finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action or appeal could have been brought at the time it was filed or noticed." See also 28 U.S.C.§ 1406(a); Goldlawr, Inc. v. Heiman, 369 U.S. 463, 467 (1962) ("'[T]he interest of justice' may require that the complaint not be dismissed but rather that it be transferred in order that the plaintiff not be penalized by what the late Judge Parker aptly characterized as 'time-consuming and justice-defeating technicalities.'") (footnote omitted). "[S]ections 1406(a) and 1631 are 'similar provision[s]' that 'confer broad discretion in ruling on a motion to transfer.'" Jackson v. L & F Martin Landscape, No. 08-3904, 2009 WL 1935931, at *2 (6th Cir. July 6, 2009) (quoting Stanifer v. Brannan, 564 F.3d 455, 456-57 (6th Cir. 2009)). "A court may decide to dismiss an action rather than transferring it under § 1631 either because (1) no permissible federal court would have jurisdiction over the action, or because (2) 'transfer would not be in the interest of justice.'" Roman v. Ashcroft, 340 F.3d 314, 328 (6th Cir. 2003) (citation omitted). Transfer is favored over dismissal because a transfer facilitates the adjudication of a dispute on the merits. Goldlawr, 369 U.S. at 466-67.

As to whether a transfer here is "in the interest of justice", this action was filed as a consolidated complaint alleging events occurring in Texas and Kansas by named Plaintiffs in different states. Plaintiffs' putative class members and Defendants reside in different states as do the knowledgeable officers, managers and employees as well as relevant documentary evidence.

Plaintiffs' assert supplemental state law claims under Texas and Kansas law. With the parties' disclosure obligations under Fed. R. Civ. P. 26(a) as well as the relevancy standard for discovery, the Court concludes that Plaintiffs need to separate their individual claims by separate complaints and to do so requires the filings of separate actions.

In sum, the Court concludes that this Court lacks jurisdiction over Defendants MHSSA and Menorah and this conclusion renders moot any consideration of Plaintiffs' motion to certify this action as a collective action as to those Defendants. These findings also reflect that MHSSA and Menorah are distinct employers that control their employees' pay in different states such that Defendant HCA is not subject to Plaintiffs' FLSA claims.

For these reasons, the Court concludes that Defendants MHSSA's and Menorah's motions to dismiss should be granted for lack of personal jurisdiction, but without prejudice to the merits of Plaintiffs' claims. Plaintiffs' alternate request for a transfer to other districts should be denied as impracticable. Plaintiff's motion to conditionally certify (Docket Entry No. 26) should be denied as moot. Plaintiffs' FLSA claims against HCA should be dismissed.

An appropriate Order is filed herewith.

**ENTERED** this the ____ day of August, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge